## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| **VILLAGE OF SCHAUMBURG, an Illinois home rule municipal corporation;** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 22CV601** |
| **v.** | ) ) ) | |
| **VIRACON, INC., a Minnesota Corporation, QUANEX IG SYSTEMS, INC., an Ohio Corporation, TRUSEAL TECHNOLOGIES, INC., a Delaware Corporation, PERMASTEELISA NORTH AMERICA CORP., a Delaware Corporation, f/k/a PERMASTEELISA CLADDING TECHNOLOGIES, LTD. d/b/a/ PERMASTEELISA CLADDING TECHNOLOGIES USA, and APOGEE ENTERPRISES INC., a Minnesota Corporation** | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | **JURY DEMAND** |

## CORRECTED VERIFIED SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Plaintiff, the VILLAGE OF SCHAUMBURG ("Village"), an Illinois home rule municipal corporation, by and through their attorneys, KLEIN, THORPE, and JENKINS, LTD., and HENNIGH LAW CORPORATION, and for its Verified Second Amended Complaint for Damages and Other Relief, brought against Defendants Viracon, Inc., a Minnesota corporation ("Viracon"), Quanex IG Systems, Inc., an Ohio Corporation ("Quanex"); and TruSeal Technologies, Inc. a Delaware corporation ("TruSeal"), Permasteelisa North America Corp., a Delaware Corporation, formerly known as, and as successor to, Permasteelisa Cladding Technologies, Ltd. doing business as Permasteelisa Cladding Technologies USA

("Permasteelisa") and Apogee Enterprises Inc., a Minnesota corporation ("Apogee") allege and state as follows:

## INTRODUCTION

1.    This is an action concerning Insulated Glass Units ("IGUs") designed for, shipped to, and installed on a building, the Renaissance Schaumburg Hotel and  Convention Center (the "Building"), which is owned by the Village of Schaumburg. The project to construct the Building was funded with public taxpayer money, thereby requiring that all entities involved act in compliance with the Illinois False Claims Act. Defendants caused the Building to be constructed with defective IGUs into the Building.  This occurred because, among other things, Defendants manufactured IGUs utilizing defective sealant that contains Gray polyisobutylene ("PIB"), which is known to degrade after prolonged exposure to the sun's ultraviolet rays over time and to form a film across the interior surfaces of the double-paned glass, obstructing the required industry standard vision space, and otherwise rendering the IGUs unfit for their purposes.  As a result of Defendants' acts and omissions and overall poor performance and due to the systemic nature of the failures, a majority if not all of the IGUs in the Building will need to be replaced.  These defects will require remediation, will disrupt the business operation and use of the Building, and have caused, and will continue to cause the Village to incur damages for labor to remove and replace, loss of revenue from hotel guests, and damage to good will, presently reasonably estimated to be in excess of $50,000,000 and well in excess of the estimated $4,200,000 to purchase new IGUs.

## THE PARTIES

2.   Plaintiff the Village of Schaumburg is an Illinois home rule municipal corporation.

3.   Defendant Viracon is a corporation formed and headquartered in Minnesota and at all relevant times was doing business as a manufacturer of insulating glass units for distribution and sale in the State of Illinois.

4.    Defendant Quanex is an Ohio corporation headquartered in Texas and at all relevant times was doing business as a manufacturer of engineered and building products and sales in the State of Illinois.

5.  Defendant TruSeal is a Delaware corporation with its headquarters in Texas, acquired by Quanex, and at all relevant times was doing business as a manufacturer of engineered and building products for distribution and sale in the State of Illinois. Quanex is its successor-in-interest and/or its alter ego.

6.  Defendant Permasteelisa is a Delaware corporation, with headquarters and principal place of buisness in Windsor, Connecticut, and doing business as a glazing subcontractor in the construction industry for the building of curtainwalls for commercial buildings in the state of Illinois.

7.  Defendant Apogee is a Minnesota corporation with its headquarters in Minnesota and at all relevant times was doing business as a manufacturer of architectural products and services for enclosing buildings for distribution and sale in the State of Illinois.

8.  At all relevant times mentioned herein, Quanex and TruSeal supplied Gray PIB to their customer Viracon. Quanex, TruSeal, and Viracon acted in concert to develop, produce, and place into the stream of commerce a product line of IGUs containing Gray PIB.

## SUBJECT-MATTER JURISDICTION

9.  This Court has subject-matter jurisdiction over the action pursuant to 28 U.S.C. § 1332, *et seq*., as the action is between citizens of different states and the amount in controversy exceeds the jurisdictional minimum of $75,000 exclusive of interest and costs.

## PERSONAL JURISDICTION

10. This Court has jurisdiction over the Defendants Viracon, Quanex, TruSeal, Permasteelisa, and Apogee based on their contacts within the forum including: i) they supplied materials and products in Illinois for use within the judicial district of the Northern District; ii) they placed their products in the stream of commerce within Illinois and specifically within the judicial district of the Northern District; iii) they caused injury and damages in Illinois within the judicial district of the Northern District by their acts or omissions both inside and outside the state; iv) they acquired substantial revenue from materials and products used in Illinois within the judicial district of the Northern District; and v) as otherwise authorized by law and consistent with

the U.S. Constitution. Additionally, Quanex has multiple facilities located in the State of Illinois. Quanex acquired TruSeal in 2004 in order to expand their window business dealings, including within the State of Illinois and the Northern District. Quanex brought all of its business under one brand name to strengthen its presence in the building and construction market. The company has at least three facilities located in the state of Illinois. Permasteelisa has performed construction services as a glazing contractor and subcontractor on multiple buildings, construction projects and improvements on real property located in the state of Illinois, including the real property owned by the Village in the state of Illinois that is the subject of this action. Apogee is a public company with a national presence and operations in multiple metropolitan areas in the United States, and has conducted extensive business in the State of Illinois.

## VENUE

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1332, *et seq*., as it is the judicial district in which: i) Schaumburg is located; ii) a substantial amount of the events or omissions giving rise to the claim occurred; and iii) the property that is the subject of the action is located.

## FACTS

12.    The Village owns the Building and the property on which it is located at 1551 N. Thoreau Drive, Schaumburg, Illinois. The Village entered into a contract for the construction of the Building on June 23, 2004 with Walsh Construction Company ("Walsh") acting as general contractor. Construction of the Building as defined and explained in the contract documents was ongoing throughout 2007 and final completion was not achieved until on or about January 8, 2008 at which time the time periods of the Buildings' multiple warranties began.

13.    The Building's exterior is a curtainwall system that includes glazing manufactured by Viracon, which contains components made by TruSeal and Quanex. A curtainwall is a system of metal work, glass, and glazing, the primary components of which are IGUs. IGUs are windows made of two or more glass panes that are hermetically sealed with a PIB sealant. Multiple IGUs are installed as the exterior of the Building to comprise the curtainwall. Each panel of the window bank is essentially a module fastened to the building's structural frame and consists of

multiple components including an IGU. In this manner, the IGUs, their joinery, and the cladding form a coordinated esthetic and the building's exterior.

14.     An IGU is the double paned window that functions as both an exterior wall and window to provide temperature and sound insulation and act as barrier like a wall while allowing the sightline visibility and transmission of natural light of a window. Each IGU has multiple component parts. Its glass panes are set parallel to each other separated evenly by a metal spacer. The panes are connected to the spacer with a silicon structural sealant. Another sealant of primarily PIB is used to create a hermetically sealed air space between the panes of glass in the IGU supporting its thermal and acoustical insulating properties.

15.     Up until about 2001, the PIB component of the IGU sealant system is historically black in color. The color is black because the PIB contains a component called carbon black. Carbon black is also well known to act as a defense against the sun's ultraviolet rays.

16.     In early 2002, Viracon's Rick Voelker, eight other Viracon employees and five Dow Corning employees completed a strategic review of the IGU market. They concluded that there was a major market shift occurring in emerging construction technologies that allowed installation of IGUs on buildings such that their edges could be seen and not covered by mullions. Building designers wanted IGUs with edges that appeared gray rather than black. Viracon projected that to compete, it would need to shift 25% of its entire production to gray colored exposed edge IGUs within two years.

17.     By February 13, 2002, Viracon's Rick Voelker internally set up a Research and Development Team of himself and three other developers to figure out how to manufacture and mass produce Gray PIB IGUs. The team's express goal was to rush to create a viable product by March 2002.

18.     Viracon involved TruSeal in the development of the IGUs using TruSeal's formula Gray PIB known as JS780 gray. Viracon had prior experience using TruSeal's black-colored JS780 formula. However, Viracon had no experience with JS780 gray.

19.    At this time, Viracon had existing written internal product development procedures. Those procedures required Viracon to determine and conduct all necessary testing on the product. It specifically required QUV testing to determine the developing products' ability to withstand the sun's ultraviolet rays. Because they act as both a window and a wall and are installed on a building's exterior, IGUs are in constant contact with sunlight and UV rays. The performance of the IGU in the sun is a critical part of developing the product. IGUs are expected to have a useful service life of at least 50 years if not the entire life of the building.

20.    In its rush to meet the rapidly emerging market, Viracon never performed the UV testing required by its own written procedures.

21.    Moreover, during the development process in the summer of 2002, Viracon ignored concerns raised between TruSeal and Viracon employees about the level of carbon black altering the accuracy of any test results. Despite these concerns Viracon pressed forward with development and production to meet the projected market demand.

22.    In its development plan, Viracon specifically knew that any IGU it manufactured would have to be certified by the Insulating Glass Certification Council ("IGCC"). The insulated glass unit market participants formed a council many decades ago whereby its participants would conduct analyses, peer review, and set standards that would result in a formal certification of an IGU design's reliability to perform throughout its expected useful life. This council is the IGCC.

23.    Further, it is common in sophisticated construction projects for the detailed written construction specifications to include requirements that the IGUs purchased and installed on a building be certified by the IGCC. When certified, the manufacturer must stamp the IGCC certification number directly onto the metal spacer bar between the IGU panes of glass. This stamp is a written representation to the end user consumer that the IGU is independently certified for quality and reliability by the IGCC.

24.    The evidence will show that Viracon never obtained the requisite testing and clear evidence of IGCC certification for its new IGU design using JS780 Gray PIB in order to properly utilize the IGCC certification stamp. The evidence will further show that Viracon was able to evade

any meaningful scrutiny by the IGCC because Viracon's own employed director, who was involved on the JS780 Gray PIB development team and who knew of the concerns over testing inaccuracies due to carbon black, was also the president of the overall IGCC. Viracon was thus in a position of direct control over the supposedly independent process to obtaining certification of the JS780 gray IGUs.

25.     By July 17, 2002, Viracon began marketing its JS 780 gray insulated glass units. Viracon's marketing materials represented the new Gray PIB IGUs had the "same performance and long-term durability" as black.

26.     In its November 2002 issue, the IGU industry publication Glass.Com published its interview with Viracon's Rick Voelker announcing that "The design community wanted a sealant that wasn't as visible and offers less contrast than the standard black silicone sealant." And, further, that "Gray sealant now gives designers and architects the ability to create a more seamless aesthetic in their buildings." According to Glass.Com, Voelker specifically represented that the durability of the IGU after moving from black to Gray PIB is "unchanged".

27.     Meanwhile, June 23, 2004, is the date of the prime contract between the Village of Schaumburg and Walsh to construct the Building. The prime contract incorporates written construction specifications that require the IGUs to be certified by the IGCC and a warranty of 20 years for the IGU sealant system. Viracon in its capacity as an architectural glass manufacturing company, reviewed the specifications for the construction of the Building and knew of the requirements.

28.     January 21, 2005 is the date of Walsh's written subcontract agreement to hire Permasteelisa to procure, install, and guarantee the performance of the IGUs.

29.     Permasteelisa promised in writing to indemnify the Village of Schaumberg against any defects in the design, workmanship, quality of materials watertightness or performance of the IGUs.

30.     Permasteelisa separately promised in writing to indemnify, defend and hold harmless the Village of Schaumburg from any damages, losses and expenses arising out of its work in the design, selection, procurement, and installation of IGUs on the Building.

31.     Permasteelisa further separately promised in writing to warrant for a period of ten (10) years after substantial completion the design, workmanship and materials in the Building's curtain wall (which includes the IGUs) from abnormal deterioration, aging and weathering, failure to function normally, deterioration/discoloration of finishes in excess of normal weathering and aging, and failure of the IGUs to meet performance requirements in the written project specifications.

32.     Permasteelisa further separately promised in writing to warrant for a period of twenty (20) years after substantial completion the design, workmanship and materials of the IGUs' cohesion/adhesion of structural silicone against abnormal deterioration, aging and weathering, failure to function normally, deterioration/discoloration of finishes in excess of normal weathering and aging, and failure of the IGUs to meet performance requirements in the written project specifications.

33.     Permasteelisa further separately promised in writing to satisfy the above described warranty obligations without cost to the Village of Schaumburg.

34.     By early 2005, Viracon had sold and shipped IGUs with JS780 Gray PIB. But Viracon was continually experiencing serious problems with the cohesiveness of the JS780 Gray PIB in its factory during the manufacturing process. The JS780 Gray PIB was unable to hold its shape and form in the same way that Viracon had experienced and relied on with black PIB.

35.     By August 3, 2005, Viracon had internally assembled a team that included members of its original research and development team to explore and analyze the difference in "comparative consistency" between the black and Gray PIB.

36.     By August 15, 2005, a Viracon employee from the original 2002 development team ("Viracon Developer 1") had prepared an internal memorandum with tables expressly demonstrating the different performance between black and Gray PIB.

37. By September 2, 2005, Viracon Developer 1 had involved the consultation of one of Truseal's original developers from 2002 ("TruSeal Developer A").

38. By October 24, 2005, Viracon Developer 1 circulated a second internal report demonstrating the results of its testing on JS780 Gray PIB cohesiveness. The report specifically identified concern about JS780 gray's ability to "maintain seal integrity".

39. The next day, TruSeal Developer A wrote a letter recommending that Viracon discontinue the use of the JS780 Gray PIB in favor of a different newly developed high viscosity Gray PIB that "will increase the cohesiveness of the product helping it retain its integrity, and continuous moisture vapor seal, during the long life of the insulating glass unit."

40. By this time, however, Viracon had already manufactured and shipped IGUs using JS 780 Gray PIB for installation on buildings. Viracon never notified end users about the risks of JS780 Gray PIB, and Viracon did not stop its production. Instead, by early 2006, Viracon fired Viracon Developer 1. Viracon never substituted the JS780 Gray PIB recommended by TruSeal.

41. In 2006, Viracon and Permasteelisa had both witnessed the JS780 gray IGUs forming a film after prolonged sun exposure. This is because a building called Station Place in Washington DC in which Permasteelisa installed the Viracon JS780 Gray PIB experienced and reported film formation.

42. By March 27, 2006, Viracon had deepened its internal efforts to come up with solutions for JS780 Gray PIB IGUs problems with unit seal performance.

43. At or about this time, the Viracon marketing team constructed a mock-up of the IGUs for the curtainwall at the Village of Schaumburg Building. The mock-up presented choices for the IGUs and inaccurately represented that the JS780 Gray PIB would fulfill the same project specifications as black.

44. By January 2, 2007, another Viracon developer working on the problem issued a research and development memo evaluating the JS780 gray competitors for replacement. ("Viracon Developer 2"). Viracon Developer 2, over the next several months would conduct a

further internal investigation about the extent of use of the JS780 Gray PIB and the knowledge of its associated risks.

45.   By May 16, 2007, the Viracon team internally referred specifically to the JS780 Gray PIB as "the bad stuff". Viracon Developer 2 stated his understanding that JS780 Gray PIB has better adhesive qualities when more carbon black is in the product and that carbon black is a key component. One week later, Viracon Developer 2 wrote to his team that he had confirmed with TruSeal Developer A that the lack of cohesive strength was because the JS780 Gray PIB did not contain significant levels of carbon black.

46.   By July 3, 2007, Viracon Developer 2 had interviewed both TruSeal Developer A and another TruSeal Developer B who had explained down to the molecular level the reason that JS780 Gray PIB could not hold its form as used by Viracon. These discussions were had in the context of discussions about the film formation problems at the Station Place project.

47.   On or about August 28, 2007, Walsh assigned to the Village of Schaumburg any rights that Walsh had to pursue warranty remedies against Permasteelisa and Viracon.

48.   Meanwhile, final completion of the construction efforts at the Village of Schaumburg's Building as defined by the construction agreements occurred no earlier than January 4, 2008. At that time, Walsh and Permasteelisa had completed all work and turned over all evidence of warranty obligations that itself, Permasteelisa, and Viracon had promised.

49.   On September 18, 2008, Viracon Developer 2 communicated directly with Viracon's Rick Voelker stating that Viracon was working with a different PIB supplier to perform QUV tests on samples from Station Place to derive a solution to the problems of the JS780 Gray PIB.

50.   Beginning in November of 2008, the Building's management company observed fogging inside windows in the Building. The company which installed the IGUs, Permasteelisa, was notified and informed the management company that the windows were still under warranty. It was then reported to Permasteelisa that two windows were leaking in the Club lounge. Three replacement windows were installed in August of 2009.

51.     By June 16, 2009, Rick Voelker and Viracon Developer 2 had completed extensive testing to predict the time film formation would begin after JS 780 gray insulated glass units were exposed to the sun.

52.     By July 14, 2009, Viracon's director of marketing was internally communicating a panicked email stating that he was being contacted by a glazing subcontractor who had confronted him about Station Place and was experiencing the same film formation at his building in Las Vegas. The Viracon marketing director was extremely concerned about his ability to continue to keep quiet about the problematic JS780 Gray PIB.

53.     By October 11, 2010, Viracon Developer 2, and TruSeal Developer B, along with seven other individuals were continuing to internally scramble to come up with solutions for the film formation eminent on the JS780 gray IGUs sold and put in place. Around this time Viracon and Quanex were cooperating under a specific agreement to remain quiet and confidential about the JS780 Gray PIB problems.

54.     On March 11, 2011, TruSeal Developer B internally circulated a memorandum to dozens of Quanex employees concerning the history of the problems with JS 780 Gray PIB with Viracon.

55.     By January 18, 2012, Viracon had been made aware of the film formation occurring on a building in New York City.

56.     On February 17, 2012, Viracon, Inc's president wrote an internal email to Rick Voelker and another Viracon employee that he was extremely concerned about the increasing liability Viracon was facing. One building owner had already forced Viracon to replace some windows and other buildings would continue to emerge and extend the risk. The president directed Rick Voelker and the other Viracon employee to "pull out all the stops with Rick [Voelker] to try to get to the root cause and figure out how to avoid liability if we are not at fault." There was no mention of notifying or protecting end user consumers who had purchased the JS780 Gray PIB.

57.     On April 3, 2012, six individuals from Quanex and Viracon met to strategize how to avoid liability for the JS780 Gray PIB film formation problem. This included Viracon Developer

2 and TruSeal Developer B. About this time, Quanex and Viracon began working on a written agreement to jointly defend against the upcoming expected possible flood of warranty claims. The written agreement was finalized October 10, 2012.

58.     By May 2012, Viracon Inc.'s 100% parent owner, Apogee Enterprises Inc., had taken complete control over Viracon Inc.'s actions and preparation of Viracon Inc.'s strategic response to the existing and anticipated flood of building owner demands that Viracon Inc. perform its contractual warranty obligations related to IGUs with JS 780 gray PIB.  This included a coordinated strategic response to existing and anticipated demands for indemnification by curtainwall contractors such as Permasteelisa.

59.     At Apogee's direction, Apogee and Viracon had collected sufficient information, conducted an investigation, interviews, and testing such that they understood the precise defect. Namely, the JS780 gray PIB was unable to withstand long term exposure to the sun when used in the exposed edge IGU design that Viracon rushed to market in 2002.

60.     Beginning at least in 2012, despite Apogee's and Viracon's full knowledge of the defect, Apogee and Viracon developed and employed a strategy to withhold its superior knowledge of the true condition and mislead its end users from acquiring knowledge that film formation would occur on all IGUs and would continue to progress such that the anticipated useful life of the IGUs would be reduced to a mere fraction of what consumers expect.

61.     The Apogee and Viracon strategy would use the end users' request for Viracon to share its superior knowledge as a tactical opportunity to adversely shift the end user focus to functions of the IGU that were irrelevant to the true problem of the Gray-PIB's inability to withstand the sun.  Instead of disclosing the Gray-PIB's inherent defect, Viracon and Apogee would redirect the discussion away from the performance attributes it warranted to (a) whether frost could appear between the panes of glass; (b) whether lites of glass had fallen off the IGU; (c) whether the Gray-PIB actually contained PIB; (d) whether there was contamination from other sources around the IGU; and (e ) overtly misrepresent to the end user that the Gray-PIB is actually supposed to move onto the vision space of the window.

62.     By May 30, 2012, Rick Voelker had prepared an internal memo marked "highly confidential" where he listed ten buildings that were beginning to show film formation in the JS780 gray IGUs and that Viracon was secretly surveilling for development of film formation. The Village of Schaumburg's Convention Center Hotel was number seven on that list. There is believed to exist a further, more extensive list of all buildings to which Viracon delivered JS 780 gray IGUs, regardless of whether film formation had started.

63.     Viracon had received a complaint from the Building's management that the Gray PIB was failing prior to May 30, 2012.  And, therefore, Viracon was informed of and aware that the Gray PIB was failing at the Building.  Specifically, Rick Voelker, who was Vice President of Technical Services for Viracon at the time, had knowledge that the Gray PIB at the Building was deficient.

64.     At the time Viracon knew of the Gray PIB failure at the Building, yet withheld information that the Gray PIB was failing, deficient in its functioning, and that it would impair the IGUs ability to function as a window and the overall appearance of the Building exterior.

65.     On January 28, 2013, the Village of Schaumburg's Building engineer gave written notice to Permasteelisa that film formation was occurring on the IGUs and demanded an immediate review and response with the necessary steps to correct the serious condition.  The precise words of the writing are set forth here:

> The windows at the property have had some issues with water seeping in-between the glass. It has become apparent that the seal in these windows are compromised. The attached pictures show the seal around the window as "melting inside the glass".

> Viracon provided the property with a 10-year warranty which addresses defective materials or workmanship which results in obstruction of vision caused by dust or film formation on the internal glass surface. Viewing the southern rooms show many of the window exhibiting this "sealant melting". I am requesting an immediate review of all the outside glass to address this integrity issue with attention on seepage, viewing and safety.

> The property is viewing this as a warranty issue.

Please respond back on the necessary steps to correct this serious condition.

66. By May 4, 2013, Viracon's liability exposure was becoming so great that its president authorized an internal communication to multiple departments directing to "quarantine the Quanex Gray PIB and not speak about this to anyone." But then in an apparent concession to maintain profits stated, "Certainly, if we are running jobs, we keep running them, but switch over to [a competitors'] gray as soon as we can."

67. In 2013, the Village of Schaumburg's Building management company notified Permasteelisa that there was window sealing issues on the south elevation of the Building; many of the windows were demonstrating sealant dripping on the inside. At that time, Building's management had been in communication with Viracon, who was to review the window issues and stated their intention to test the butyl inside of the windows previously removed. The windows were sent to Viracon and the testing was done in October of 2013. Viracon indicated that the material would be sent to another lab to confirm test results. By December, no update as to testing was given to the Building management.

68. Within the time periods set forth by the contractual warranties for the IGUs on the Building, a meeting between the Building's management, Rick Voelker and Bob Carlson from Viracon and John Sanji from Permasteelisa occurred in February 2014. Viracon made a subsequent offer to replace the glass as a "gesture of good will" since their proposed warranty disclaimer excluded replacing labor costs by way of a letter from Rick Voelker, Vice President of Technical Services. Viracon maintained the issues were cosmetic only. In his letter, Voelker states that Viracon previously visited this facility to inspect the glass and see the condition that exists in some of the IGUs installed in the Building.

69. The next day, on February 5, 2014, Rick Voelker sent a letter to Robert Lang, Director of Engineering at the Building, regarding Viracon's position on the Gray PIB at the Building. He advised that the PIB had not failed, but rather only acknowledged uncharacteristic movement in some IGUs and he characterized them as "cosmetic" failures only. Viracon knew

that the Gray PIB's deficiencies were beyond cosmetic at the time the IGUs were sold and installed at the Building. In fact, Viracon knew that the Gray PIB failed to function as it should and the condition of the IGUs and the Building would deteriorate because of the deficient qualities of the Gray PIB. Despite this knowledge, Viracon failed to replace all the windows at the time the condition was reported to Viracon.

70. Consistent with the Apogee and Viracon strategy, Rick Voelker refused to share Viracon's superior knowledge of the true problem that the Gray-PIB IGU's could not withstand the sun. Rick Voelker's letter instead redirected the reader's discussion away from the film formation performance attributes it warranted, and instead in bad faith misdirected the inquiry to (a) whether frost could appear between the panes of glass; (b) whether lites of glass had fallen off the IGU; (c) whether the Gray-PIB actually contained PIB; (d) whether there was contamination from other sources around the IGU; and (e) he overtly misrepresented to the Village that the Gray-PIB was actually supposed to move onto the vision space of the window.

71. The representations in the letter concerning the IGUs' film formation and the nature of the problem were entirely false, specifically and carefully crafted with the intent to deliberately mislead the Village and steer the Village away from pursuing any warranty claims. Thus, despite the fact that the Village had properly notified them of the existence a problem of which Viracon and Permasteelisa had superior knowledge to understand was within the coverage of the warranty and the time periods for the warranties, Viracon and Permasteelisa suppressed and concealed their superior knowledge of the true building conditions, the progressive nature of the JS780 Gray PIB deterioration within each and every IGU on the building, intentionally misled the Village away from the true facts, and breached their duties under the existing contract warranties.

72. More fogging and condensation presented itself in more of the Building's windows in November of 2018. The Building's management requested replacement windows from Viracon. Viracon provided replacement glass only under the warranty for a limited number of windows.

73. From the inception of its involvement with the Village's Building Viracon, Truseal, Quanex, and Permasteelisa, withheld and actively concealed their knowledge that the film formation was a progressive condition that would begin and continue on any IGU exposed to the sun from the Village and continued to withhold such information as they attained more and more knowledge about the defective Gray PIB over the course of several years, including all the way up to the present.

74. In October of 2019, the Building's General Manager contacted Viracon on behalf of the Village regarding the continuing and further appearance of film formation on new IGUs throughout the IGU product installed at the Building. This continued appearance of the progressive problem was the exact opposite of the representations about the condition made by Permasteelisa and Viracon in February 2014.

75. On or about July 3, 2020, the Village contacted other building owners who had experienced the JS780 Gray PIB film formation, and they shared the evidence described above that allowed the Village to discover that they had been defrauded by Viracon and Permasteelisa. Specifically, Viracon, Permasteelisa, and Quanex knew but misrepresented that JS780 Gray PIB was as durable as JS780 Black PIB. Viracon stamped each and every IGU with a false representation that the IGU was built in conformance with IGCC certification. Viracon and Permasteelisa submitted IGUs on a publicly-funded project as being in compliance with project specifications, when they were not. And Viracon and Permasteelisa directly and overtly misled the Village in February 2014 about the true nature of the condition of all of the IGUs that possessed JS780 Gray and that the IGUs could not survive the duration of the IGU's expected useful life.

76. The Village has conducted surveys of the Building to evaluate the windows. One survey determined that there was PIB sealant migration on 90.2% of all accessible IGUs; 497 of 551 IGUs observed had visible PIB sealant migration.

77. Upon information and belief, the mottling of the Gray PIB that creates the IGUs hermetic seal occurs as a result of a performance malfunction and failure of the Gray PIB. Due to the performance malfunction, the Gray PIB has gradually and progressively formed a film

migrating into the sightlines and glass of the IGUs impairing their ability to function as a window and the overall appearance of the Building exterior.  The film appears in various ways such as a dramatic expansion or stretching, a bubbling from the spacer onto the panes' interior surfaces, long solitary icicles, or a dripping band of seepage.  Industry standard and manufacturer tolerances for the movement of PIB to extend into the sightline of the IGUs are no more than an eighth of an inch.  Upon information and belief, all of the building's IGUs are manufactured with the same Gray PIB, and to varying degrees most are experiencing mottling and migration beyond industry and manufacturer standards.  Further, upon information and belief, the Gray PIB mottling and migration is continuing and progressing such that the problem will worsen over time in all of the Building's IGUs.

78.    Upon information and belief, the performance and longevity of the Gray PIB is not equal to that of the standard black PIB.

79.    The Village is informed and believes, and on that basis alleges, that for years, the industry standard PIB was black in color and included an ingredient called carbon black.  Carbon black has numerous beneficial properties in this application, including protecting the PIB from degrading in sunlight.  Nevertheless, Viracon used Gray PIB in manufacturing the IGUs for the Building and Quanex and TruSeal continued to manufacture the Gray PIB that was used for the IGUs of the Building.

80.    Viracon, Quanex, and TruSeal each had knowledge that the Gray PIB was defective and its performance was inferior to that of black PIB, and that due to the defective nature, the IGUs manufactured with Gray PIB would not be suitable for their intended purposes and that the performance of the Gray PIB and IGUs would not endure as intended or required. The Village is informed and believes, and on that basis alleges, that prior to the start of construction at the Building, and continuing through the installation of the IGUs on the Building, Viracon, Quanex, and TruSeal acquired knowledge that the Gray PIB was defective and would fail.  Indeed, as early as 2005, Viracon was experiencing problems with the Gray PIB on the production line, which was

communicated to Quanex and TruSeal, and which were not resolved by the time that Viracon began manufacturing and delivering the IGUs for use on the Building.

81.    The Village is informed and believes that concurrently with the manufacturing and installation of defective IGUs for the Building, Viracon, Quanex, and TruSeal each knew of other buildings experiencing the same defective Gray PIB issues including lack of adhesion and/or cohesion, film formation and the failure of the hermetic seal, caused by among other things, its inability to withstand direct and indirect exposure to sunlight without suffering a decrease in its molecular weight. Instead of informing the Village or others involved with the development of the Building about the defect or defects, Quanex and TruSeal continued to provide Gray PIB to Viracon, and Viracon continued to manufacture IGUs with the Gray PIB sealant, deliver them to the Village, and allow them to be installed at the Building.

82.    The Defendants understood and knew that the type of damages the Village complains of here were likely to occur, more likely to occur than if standard black PIB were used in the IGUs, and did nothing to prevent the Gray PIB from reaching the marketplace, or prevent the installation of IGUs using the Gray PIB on the Building. Nor did the Defendants ever warn of the high potential that the damages complained of herein would occur if Gray PIB was used. Defendants also took no action to inform the Village or others involved with the development of the Building after installation of the Building's IGUs of Gray PIB's performance issues known to Defendants, nor did Defendants undertake any form of investigation, provide notice, or recommend maintenance or mitigation measures related to the IGUs containing the Gray PIB. Instead, the Defendants each prepared and disseminated product literature indicating the Gray PIB performed as well as the black PIB and could be used interchangeably with identical results.

## COUNT I:  STRICT PRODUCTS LIABILITY AGAINST VIRACON

83.    The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 82.

84.    At all relevant times, Viracon was the manufacturer, marketer, distributor, supplier and/or seller of the IGUs sold to and installed at the Building as defined by 735 ILCS 5/2-2101.

85. At all relevant times, Quanex and/or TruSeal manufactured and sold to Viracon, and thereby placed on the market, the Gray PIB used on the IGUs for the Building.

86. Viracon manufactured and sold, and thereby placed on the market, the IGUs used on the building.

87. Viracon knew it would be supplying IGUs to the Building and that Viracon was responsible for the quality of the IGUs.

88. In so placing the IGUs on the market, Viracon knew that the IGUs were to be used without inspection for defects. Further, Viracon knew that it was supplying IGUs to the Building and that Viracon was responsible for the quality of the IGUs.

89. The IGUs supplied and manufactured by Viracon contained latent manufacturing, design, and warning defects that caused physical damage to the Building. The IGUs contained those latent defects when they left Viracon's possession.

90. The IGUs had potential risks that were known or knowable in light of the scientific knowledge that was generally accepted in the scientific community at the time they were manufactured and installed at the Building. The IGUs were and are dangerous to an extent beyond that which would be contemplated and expected by the ordinary consumer of such products with the ordinary knowledge common to the community as to the characteristics of such products. The IGUs were and are defective as a consequence of design flaws and/or manufacturing defects by Viracon. Viracon failed to adequately warn the Village or others involved of the risks.

91. The IGUs were intended to and did reach the Building without substantial change from the condition in which they were manufactured, marketed, sold and distributed by Viracon.

92. The IGUs were installed and used in the Building in the manner in which they were manufactured, marketed, sold and distributed by Viracon.

93. The IGUs provided by Viracon were and are not reasonably safe as designed and manufactured, because they are prematurely deteriorating and failing to perform as intended. Viracon did not provide adequate warnings at the time of the IGUs manufacture of the likelihood

that the IGUs would cause the Village harms as complained herein or similar harms or the seriousness of such harms that would require destruction, removal and replacement of other components of the Building in order to obtain access to the areas in need of remediation at the Building. Meanwhile, there is continued water intrusion that will lead to further damages. Such repairs will also cause loss of use of the Building. The IGUs use and rely on the inferior and defective Gray PIB as a primary seal which has led and will continue to lead to the above-described property damage and other damages at the Building beyond that contemplated by an ordinary user.

94. If Viracon had warned the Village or others involved with the Building of the increased likelihood of failure of IGUs made with Gray PIB as opposed to those made with standard Black PIB, and the type and seriousness of the potential failures, the Village or others involved with the Building could and would have prevented Gray PIB IGUs from being used at the Building.

95. The defects in the IGUs were the foreseeable and proximate cause of considerable property damage and other damages to the Building and the Village, including, but not limited to, those parts of the Building that are not the IGUs.

96. As a direct and proximate result of Viracon's acts or omissions, the Village has suffered injury and damages in excess of the jurisdictional minimum. Specifically, the Village has incurred and will continue to incur substantial costs to investigate and identify the numerous deficiencies and defects with IGUs and Gray PIB sealant, and has and will continue to incur substantial additional costs to repair the deficient work, costs to repair property damaged by deficient work, and has suffered special, consequential, and other damages, all in amounts according to proof at trial.

## COUNT II:  STRICT PRODUCTS LIABILITY AGAINST QUANEX AND TRUSEAL

97. The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 96.

98.    At all relevant time Quanex and TruSeal were the manufacturers, marketers, distributors, suppliers and/or sellers of the Gray PIB used on the IGUs at the Building as defined by 735 ILCS 5/2-2101.

99.    At all relevant times, Quanex and/or TruSeal manufactured and sold to Viracon, and thereby placed on the market, the Gray PIB used on the IGUs for the Building.

100.   Viracon manufactured and sold, and thereby placed on the market, the IGUs used on the building.

101.   Quanex and/or TruSeal knew it would be supplying Gray PIB to Viracon for incorporation into IGUs that would be supplied for installation at projects like the Building.

102.   In so placing the IGUs on the market, Quanex and/or TruSeal knew that the IGUs were to be used without inspection for defects.  Further, Quanex and/or TruSeal knew that it was supplying Gray PIB for incorporation into IGUs at the Building and that Quanex and/or TruSeal was responsible for the quality of that Gray PIB.

103.   The Gray PIB supplied and manufactured by Quanex and/or TruSeal contained latent manufacturing, design, and warning defects that caused physical damage to the Building.  The Gray PIB contained those latent defects when they left Quanex and/or TruSeal's possession.

104.   The Gray PIB had potential risks that were known or knowable in light of the scientific knowledge that was generally accepted  in the scientific community at  the time they were manufactured and installed at the Building.  The Gray PIB was and is dangerous to an extent beyond that which would be contemplated and expected by the ordinary consumer of such products with the ordinary knowledge common to the community as to the characteristics of such products.  The Gray PIB was and is defective as a consequence of design flaws and/or manufacturing defects by Quanex and/or TruSeal.  Quanex and/or TruSeal failed to adequately warn the Village or others involved of the risks.

105.   The Gray PIB was intended to and did reach the Building without substantial change from the condition in which it was manufactured, marketed, sold and distributed by Quanex  and/or TruSeal.

106.  The Gray PIB was installed and used in the Building in the manner in which it was manufactured, marketed, sold and distributed by Quanex and/or TruSeal.

107.  The Gray PIB provided by Quanex and/or TruSeal was and is not reasonably safe as designed and manufactured, because it is prematurely deteriorating and failing to perform as intended.  Quanex and/or TruSeal did not provide adequate warnings at the time of the Gray PIB manufacture of the likelihood that the Gray PIB would cause the Village harms as complained herein or similar harms or the seriousness of such harms that would require destruction, removal and replacement of other components of the Building in order to obtain access to the areas in need of remediation at the Building.  Meanwhile, there is continued water intrusion that will lead to further damages.  Such repairs will also cause loss of use of the Building.  The Gray PIB is inferior and defective as a primary seal on the IGUs, which has led and will continue to lead to the above-described property damage and other damages at the Building beyond that contemplated by an ordinary user.

108.  If Quanex and/or TruSeal had warned the Village or others involved with the Building of the increased likelihood of failure of the Gray PIB as opposed to the standard Black PIB, and the type and seriousness of the potential failures, the Village or others involved with the Building could and would have prevented Gray PIB IGUs from being used at the Building.

109.  The defects in the IGUs were the foreseeable and proximate cause of considerable property damage and other damages to the Building and the Village, including, but not limited to, those parts of the Building that are not the IGUs.

110.  As a direct and proximate result of Quanex and/or TruSeal's acts or omissions, the Village has suffered injury and damages in excess of the jurisdictional minimum.  Specifically, the Village has incurred and will continue to incur substantial costs to investigate and identify the numerous deficiencies and defects with IGUs and Gray PIB sealant, and has and will continue to incur substantial additional costs to repair the deficient work, costs to repair property damaged by deficient work, and has suffered special, consequential, and other damages, all in amounts according to proof at trial.

## COUNT III: BREACH OF EXPRESS AND IMPLIED WARRANTY AGAINST VIRACON

111. The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 110.

112. Viracon agreed to manufacture and supply the IGUs in accordance with the published Specifications, which expressly warranted that the IGUs would be free from defects for a period of ten years. Viracon agreed that said warranties were guaranteed direct to the Village.

113. Walsh Construction Company entered into a subcontract with Viracon whereby the IGUs were purchased and to be used on the Building. As the owner of the Building, the Village was an intended third party beneficiary of the subcontract.

114. There are express and implied warranties in the subcontract pursuant to which Viracon ensured that the IGUs it manufactured were free of deficiencies, defects or Viracon breached the express and implied warranties in the subcontract by providing defective IGUs.

115. As a direct and proximate result of Viracon's breach of express and implied warranties as set forth above, the Village has suffered injury and damages. Specifically, the Village has incurred and will continue to incur substantial costs to investigate and identify the numerous deficiencies and defects with the IGUs, and has and will continue to incur substantial additional costs to repair the deficient work, costs to repair property damaged by deficient work, and has suffered special, consequential, and other damages, and is entitled to recover damages as alleged.

## COUNT IV: FRAUD AGAINST VIRACON

116. The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 115.

117. Viracon's product literature indicated that the IGUs it manufactured that were ultimately installed at the Building were suitable for their intended purpose to provide temperature and sound insulation and act as barrier while allowing the sightline visibility and transmission of natural light, and that such performance would endure. Viracon's product literature also misrepresented that the IGUs manufactured with Gray PIB would perform and endure as the

equivalent of the IGUs manufactured with standard Black PIB. Such misrepresentations by Viracon were made to induce purchases of IGUs that were manufactured with Gray PIB, purchases such as those that resulted in the IGUs installed at the Building.

118.  Furthermore, the Village is informed and believes, and on that basis alleges, that for years, the industry standard PIB was black and included an ingredient called carbon black. Carbon black has numerous beneficial properties in this application, including protecting the PIB from degrading in sunlight. Nevertheless, Viracon used Gray PIB in manufacturing the IGUs for the Building.

119.  Viracon had knowledge that the Gray PIB was defective and its performance was inferior to that of Black PIB, and that due to the defective nature, the Gray PIB and IGUs would not be suitable for their intended purposes and that the performance of the Gray PIB and IGUs would not endure as intended or required. The Village is informed and believes, and on that basis alleges, that prior to the start of construction at the Building, and continuing through the installation of the IGUs on the Building, Viracon acquired knowledge that the Gray PIB it was using was defective and would fail. As early as 2005, Viracon was experiencing problems with the Gray PIB on the production line, which were not resolved by the time that Viracon began manufacturing and delivering the IGUs for use on the Building.

120.  Furthermore, the Village is informed and believes that concurrently with the manufacturing and installation of defective IGUs on the Building, Viracon knew of other buildings experiencing the same defective Gray PIB issues including lack of adhesion and/or cohesion, film formation and the failure of the hermetic seal, caused by among other things, its inability to withstand direct and indirect exposure to sunlight without suffering a decrease in its molecular weight. Instead of informing the Village or others involved with the development of the Building about the defect or defects, Viracon continued to manufacture IGUs with the Gray PIB sealant, deliver them to the Village, and allow them to be installed at the Building.

121.  With knowledge of the falsity of its representation that IGUs manufactured with Gray PIB would function as the equivalent to those manufactured with Black PIB, Viracon put

IGUs containing inferior and defective Gray PIB into the marketplace and did not provide notice of their defective and inferior qualities.

122. The Village is informed and believes, and on that basis alleges, that as between the Village and those involved with the development of the Building on the one hand and Viracon on the other hand, Viracon alone had knowledge of such material facts and actively misrepresented the known information in addition to intentionally concealing this information from the Village and others involved with the development of the Building. In pursuit of profits, with oppression, fraud, malice, deliberate or flagrant disregard, reckless indifference, and/or evil motive and with conscious disregard of the Village's rights, Viracon continued to manufacture and deliver defective Gray PIB and IGUs for installation at the Building. This was in disregard to the unjust hardship to the Village of ultimately having to remove and replace all of the IGUs at the Building. This conduct was authorized by managing agents at Viracon who possessed knowledge of the defective performance of the Gray PIB both during the IGU production and as installed in the field and the continued keeping of the information secret; and who also falsely marketed, since at least July 15, 2002, that the Gray PIB had the same long term durability as IGUs utilizing Black PIB for its primary seal.

123. The Village and those involved with the development of the Building had no knowledge of any problems with the Gray PIB being used in the IGUs at the Building, nor was such information reasonably discoverable by the Village. Accordingly, the Village and those involved with the development of the Building reasonably relied on Viracon's apparent reputation as a manufacturer of high-quality IGUs, and Viracon's non-disclosure of the problems plaguing IGUs utilizing Gray PIB primary sealant.

124. Had the Village or others involved with the development of the Building known that the Gray PIB was causing Viracon's unusual production problems and the owners of other buildings to suffer damages from defective IGUs, or been advised that Gray PIB IGUs would perform in the manner actually experienced at the Building, the Village would not have allowed the Gray PIB to be used in the IGUs installed at the Building.

125.  Viracon was required to inform customers in order to avoid allowing customers to use and be damaged by a product it manufactured and knew to be defective particularly in light of the seriousness of the damages its concealment would cause including those necessary to repair the IGUs.

126.  As a direct and proximate result of Viracon's concealment of these facts from the Village and those involved with the development of the Building and the placement of approximately six hundred IGUs at the Building with defective Gray PIB, the Village has suffered injuries and damages in excess of the jurisdictional minimum, which will be established in an amount according to proof at trial.

127.  Further, Viracon's conduct, as alleged above, was done with an intentional and conscious disregard of the Village's rights and with oppression, fraud, malice, deliberate or flagrant disregard, reckless indifference, and/or evil motive entitling the Village to an award of punitive and exemplary damages  assessed against Viracon, in sums  according to proof,  as  a means of deterring Viracon from committing similar acts and omissions in the future and punishing Viracon for its wrongful conduct.

## COUNT V:  FRAUD AGAINST QUANEX AND TRUSEAL

128.  The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 127.

129.  The Village is informed and believes, and on that basis alleges, that for years, the industry standard PIB was black and included an ingredient called carbon black. Carbon black has numerous beneficial properties in this application, including protecting the PIB from degrading in sunlight.  Nevertheless, Quanex and TruSeal developed, marketed, and sold Gray PIB that was used at the Building.

130.  Quanex and TruSeal had knowledge that the Gray PIB was defective and its performance was inferior to that of Black PIB, and that due to the defective nature, the Gray PIB would not be suitable for its intended purpose and that the performance of Gray PIB IGUs would not endure as intended or required. The Village is informed and believes, and on that basis  alleges,

that prior to the start of construction at the Building, and continuing through the installation of the IGUs on the Building, Quanex and TruSeal acquired knowledge that the Gray PIB it was using was defective and would fail. As early as 2005, Quanex and TruSeal learned that Viracon was experiencing problems with the Gray PIB on the production line, which were not resolved by the time that Viracon began manufacturing and delivering the IGUs for use on the Building.

131. Furthermore, the Village is informed and believes that concurrently with the manufacturing and installation of defective IGUs on the Building, Quanex and TruSeal knew of other buildings experiencing the same defective Gray PIB issues including lack of adhesion and/or cohesion, film formation and the failure of the hermetic seal, caused by among other things, its inability to withstand direct and indirect exposure to sunlight without suffering a decrease in its molecular weight. Instead of informing the Village or others involved with the development of the Building about the defect or defects, Quanex and TruSeal continued to manufacture Gray PIB sealant for IGUs which were to be delivered to the Village, and allow them to be installed at the Building.

132. With knowledge of the falsity of its representation that Gray PIB would function as the equivalent to Black PIB, Quanex and TruSeal allowed IGUs to be manufactured that contained inferior and defective Gray PIB, which entered the marketplace with no notice of their defective and inferior qualities.

133. The Village is informed and believes, and on that basis alleges, that as between the Village and those involved with the development of the Building on the one hand and Quanex and TruSeal on the other, Quanex and TruSeal alone had knowledge of such material facts and intentionally concealed this information from the Village and others involved with the development of the Building. In despicable pursuit of profits, with oppression, fraud, malice, deliberate or flagrant disregard, reckless indifference, and/or evil motive and with conscious disregard of the Village's rights, Quanex and TruSeal continued to manufacture and deliver defective Gray PIB for installation into the curtainwall system at the Building. This was in disregard to the unjust hardship to the Village of ultimately having to remove and replace all of

the IGUs at the Building. This conduct was authorized by managing agents at Quanex and TruSeal who possessed knowledge of the defective performance of the Gray PIB both during the IG Unit production and as installed in the field and the continued keeping of the information secret; and who also falsely marketed, since at least July 15, 2002, that the Gray PIB had the same long term durability as IGUs utilizing Black PIB for its primary seal.

134.   The Village and those involved with the development of the Building had no knowledge of any problems with the Gray PIB being used in the IGUs at the Building, nor was such information reasonably discoverable by the Village. Accordingly, the Village and those involved with the development of the Building reasonably relied on Viracon's apparent reputation as a manufacturer of high-quality IGUs, and Viracon's non-disclosure of the problems plaguing IGUs utilizing Gray PIB primary sealant.

135.   Had the Village or others involved with the development of the Building known that the Gray PIB was causing Viracon's unusual production problems and the owners of other buildings to suffer damages from defective IGUs, or been advised that Gray PIB would perform in the manner actually experienced at the Building, the Village or others involved with the development of the Building would not have allowed the Gray PIB to be installed at the Building.

136.   Quanex and TruSeal were required to inform customers to avoid allowing consumers to use and be damaged by a product it manufactured and knew to be defective particularly in light of the seriousness of the damages its concealment would cause including those necessary to repair the Gray PIB.

137.   As a direct and proximate result of Quanex and TruSeal's concealment of these facts from the Village and those involved with the development of the Building and the placement of approximately six hundred IGUs at the Building with defective Gray PIB, the Village has suffered injuries and damages in excess of the jurisdictional minimum, which will be established in an amount according to proof at trial.

138. Further, Quanex and TruSeal's conduct, as alleged above, was done with an intentional and conscious disregard of the Village's rights and with oppression, fraud, malice, deliberate or flagrant disregard, reckless indifference, and/or evil motive entitling the Village to an award of punitive and exemplary damages assessed against Quanex and TruSeal, in sums according to proof, as a means of deterring Qualex and TruSeal from committing similar acts and omissions in the future and punishing Quanex and TruSeal for their wrongful conduct.

## COUNT VI: DECLARATORY RELIEF REGARDING RIGHT TO INDEMNIFICATION AGAINST PERMASTEELISA

139. The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 138.

140. Under the provisions of Section 2-701 of the Code of Civil Procedure (735 ILCS 5/2-701) this court is vested with the power to declare the rights and liabilities under the indemnification provisions at issue.

141. Permasteelisa agreed in writing to indemnify, defend, and hold harmless the Village of Schaumberg against any damages, losses and expenses related to remedying any defects in the design, workmanship, quality of materials watertightness or performance of the IGUs.

142. On January 28, 2013, and in communications thereafter, the Village invoked Permasteelisa's duties to indemnify, defend, and hold harmless.

143. The Village has duly performed any and all acts and things necessary to satisfy any obligations the Village has that are related to Permasteelisa's duties to indemnify, defend, and hold harmless.

144. The Village has begun to incur and will continue to incur damages, losses and expenses related to remedying any defects in the design, workmanship, quality of materials

watertightness or performance of the IGUs.

145. The Village is informed and believes that it is the position of Permasteelisa that the Village is not entitled to indemnification as alleged herein.

146. Plaintiff requests that the Court enter a judgment or order declaring the rights of the Village and the obligations of Permasteelisa as to remedying any defects in the design, workmanship, quality of materials watertightness or performance of the IGUs.

### COUNT VII: BREACH OF CONTRACT AGAINST PERMASTEELISA

147. The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 146.

148. Permasteelisa agreed to writing to warrant directly to the Village the design, workmanship and materials in the Building's curtainwall which includes the IGUs, and the cohesion/adhesion of structural silicon in the IGUs, against abnormal deterioration, aging and weathering, failure to function normally, deterioration/discoloration of finishes in excess of normal weathering and aging, and failure of the IGUs to meet performance requirements in the written project specifications. In addition to the Village's rights under the warranties, the Village is an assignee of the Permasteelisa obligations promised in Permasteelisa's subcontract with the general contractor for the original construction.

149. Within the warranty time periods promised by Permasteelisa, the Village invoked Permasteelisa's contractual obligations to perform the warranty work by giving Permasteelisa notice of the IGUs conditions and demanding Permasteelisa's performance.

150. The Village has performed all of the terms and conditions of the contract on its part to be performed pursuant to its contract with Permasteelisa. The above promises to the Village by Permasteelisa were a basis of the bargain for the Village allowing Permasteelisa to perform

construction services on the Building and paying Permasteelisa for those services.

151.  Permasteelisa has breached and failed to perform theses contractual obligations.

152.  As a direct and proximate result of Permasteelisa's breach of contract as set forth above, the Village has incurred and will continue to incur injury and damages. Specifically, the Village has incurred and will continue to incur damages, losses and expenses related to remedying the work.

## COUNT VIII: FRAUD AGAINST VIRACON AND APOGEE

153.  The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 152.

154.  Under Illinois' direct participant liability doctrine, a parent corporation may not invoke the corporate shield to evade liability for the acts of a subsidiary corporation if the parent corporation exerted control over its subsidiary's actions which caused the injury. This doctrine is an exception to the requirements of proof to piercing the corporate veil, and holds that the parent is liable for the subsidiary's tortious conduct, including fraud, if the parent directed actions by exerting control over business or budgetary strategy of the subsidiary.

155.  Beginning at least in 2012, in anticipation of the existing and future flood of building owner demands on Viracon to incur the economic expense necessary to meet Viracon's obligations to remedy the defective Gray-PIB IGUs installed on multiple buildings, Apogee descended into Viracon. Rather than develop a good faith plan to meet Viracon's obligations toward the building owners and glazing contractors, Apogee and Viracon developed and directed a strategy of misleading building owners to misdirect them away from enforcing their rights against Viracon. Because Viracon's warranty obligations had time limits after which Viracon could claim that it no longer had any obligations, the Apogee-Viracon strategy intentionally slowed and delayed Viracon's responses to building owner demands.

156.  Here, on January 28, 2013, the Village demanded that Permasteelisa immediately review the film formation, diagnose, and respond with information about the necessary steps to correct the serious condition.  Permasteelisa immediate conveyed the notice to Viracon.  However, Viracon delayed any response for over one year.

157.  Then on February 5, 2014, knowing that the Village was relying on the belief in Viracon's superior knowledge and their obligation to be truthful, rather than disclose the information that Viracon knew concerning the true progressive nature of the film formation and the inability for JS780 Gray-PIB to withstand the sun, Viracon carried out the Apogee strategy by fraudulently misrepresenting that the only relevant inquiries about the film formation were (a) whether frost could appear between the panes of glass;  (b)  whether  lites  of glass  had  fallen off  the  IGU;  (c)  whether  the  Gray-PIB  actually contained PIB; and (d) whether there was contamination from other sources around the IGU.

158.  Viracon further intentionally mislead the Village by representing that because the Gray-PIB was non-curing during Viracon's assembly of the IGUs, then the Gray-PIB should have normal movement after assembly.  In other words, Viracon represented that the end user should expect that the IGU have *some* film formation into the vision space. Viracon knew that this representation was false because Viracon's own industry publications state the industry standard is that the PIB cannot encroach into the vision space of the glass more than an eighth-of-an-inch from the spacer.  This 1/8" tolerance is almost as close to zero tolerance as possible, and certainly far different than the condition at the Building investigated by Permasteelisa and Viracon.

159.  Further, by focusing away from the true nature of the problem, Viracon's response falsely misrepresented it had given a complete and reliable diagnosis of the film formation.  This was false because Viracon intentionally did not inform the Village that the JS780-Gray PIB would become progressively worse and that all IGUs contained the same JS780-Gray PIB and were simply in different stages of progression.

160.  The Village relied to its detriment on the Viracon fraudulent misrepresentation from Apogee's strategy by delaying any effort to purchase and procure labor and materials to remove

and replace the IGUs in 2013. Now, with the construction cost escalation nearly a decade later, the repair and remediation that the Village knows is necessary will cost significantly more than what it could have cost in 2013. Apogee is directly responsible for bringing about those additional construction costs over and above the costs in 2013.

161. Viracon's and Apogee's conduct, as alleged above, was done with an intentional and conscious disregard of the Village's rights and with oppression, fraud, malice, deliberate or flagrant disregard, reckless indifference, and/or evil motive entitling the Village to an award of punitive and exemplary damages assessed against these defendants, in sums according to proof, as a means of deterring these defendants from committing similar acts and omissions in the future and punishing these defendants for their wrongful conduct.

## COUNT IX: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

## AGAINST APOGEE

162. The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 161.

163. Viracon and Permasteelisa breached their contractual and warranty obligations to the Village.

164. Apogee caused and directed Viracon to breach its obligations to the Village by directly participating in and orchestrating an intentional response to mislead the Village about the true nature of the film formation and the known defects with the IGUs. This, in turn, contributed to Permasteelisa's breach of contractual obligations to the Village concerning the IGUs.

165. Apogee's interference was unjustified and was done with the intent to place its pecuniary interests over the rights of the Village owed to it by Viracon and Permasteelisa. This plan was an intentional and conscious disregard of the Village's rights carried out with oppression, fraud, malice, deliberate or flagrant disregard, reckless indifference. As a direct and proximate

result of Apogee's interference as alleged herein, the Village has suffered injuries and damages in excess of the jurisdictional minimum, which will be established in an amount according to proof at trial.

166. The court is empowered to impose punitive and exemplary damages assessed against this defendant, in sums according to proof, as a means of deterring these defendants from committing similar acts and omissions in the future and punishing these defendants for their wrongful conduct. The Village requests that the Court do so.

<u>JOINT AND SEVERAL LIABILITY</u>

167. The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 166.

168. Pursuant to 735 ILCS 5/2-1117, Viracon, Quanex,, TruSeal, Permasteelisa, and Apogee are jointly and severally liable for the damages of the Village because the Village was not at fault in incurring the property damages at the Building and the defendants acted in concert with each other in causing the damages.

<u>PUNITIVE DAMAGES</u>

169. The Village incorporates herein by reference the allegations contained in Paragraphs 1 through 168.

170. The Village seeks punitive and exemplary damages against Viracon under 735 ILCS 5/2-604.1 allowing for such in the cases of products liability and fraud allegations.

171. The Village seeks punitive and exemplary damages against Quanex under 735 ILCS 5/2-604.1 allowing for such in the cases of products liability and fraud allegations.

172. The Village seeks punitive and exemplary damages against TruSeal under 735 ILCS 5/2-604.1 allowing for such in the cases of products liability and fraud allegations.

173. The Village seeks punitive and exemplary damages against Apogee under 735 ILCS 5/2-604.1 allowing for such in the cases of fraud and tortious interference allegations.

## DEMAND FOR JURY TRIAL

174. The Village demands that all issues herein be tried by a jury pursuant to FRCP Rule 38.

## PRAYER FOR RELIEF

Wherefore, the Village prays for judgment against Viracon, Quanex, TruSeal, Permasteelisa, and Apogee as follows:

1. For compensatory damages according to proof at trial;

2. For general, special, and other damages according to proof at trial;

3. For costs of investigation to identify the defects and necessary repairs;

4. For pre-judgment and post-judgment interest at the maximum amount and rate permitted by law;

5. For costs of suit herein;

6. For punitive and/or exemplary damages; and

7. For such other relief as the Court may deem just and proper.

Respectfully submitted,

VILLAGE OF SCHAUMBURG

/s/ *Lance C. Malina*

| | |
|---|---|
| Lance C. Malina | Scott E. Hennigh |
| John Allen Wall | Mathew R. Troughton |
| Howard C. Jablecki | Garrett M. Mott |
| Colleen M. Shannon | Azadeh Allayee |
| Klein, Thorpe & Jenkins, Ltd. | Erik Gonzalez |
| 20 N. Wacker Drive, Ste. 1600 | 4 Embarcadero Center, Ste. 1400 |
| Chicago, IL 60606 | San Francisco, CA 94111 |
| (312) 984-6400 | (415) 385-5385 |
| lcmalina@ktjlaw.com | scott.hennigh@hennighlaw.com |
| jawall@ktjlaw.com | mathew.troughton@hennighlaw.com |
| hcjablecki@ktjlaw.com | garrett.mott@hennighlaw.com |
| cmshannon@ktjlaw.com | azadeh.allayee@hennighlaw.com |
| *Attorneys for Plaintiff* | erik.gonzalez@hennighlaw.com |
| | *Attorneys for Plaintiff* |

**STATE OF ILLINOIS** )
                              ) SS

**COUNTY OF COOK** )

## **VERIFICATION**

I, Brian A. Townsend, being first duly sworn on oath, depose and state that I am the duly

authorized Village Manager for the Village of Schaumburg, and the duly authorized agent of the

Village for purposes of making this Affidavit; that I have read the foregoing Second Amended

Complaint for Damages and Other Relief; that I have personal knowledge of the content thereof

and that the matters set forth therein are true and correct in substance and in fact to the best of

my knowledge.

By: _____
           Brian A. Townsend

SUBSCRIBED AND SWORN TO
Before me on this 21st day of
November 2022.

_____
      Notary Public

OFFICIAL SEAL
RENEE M ROMANOWSKI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 7/22/2026